IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL TRAVIS BUCKLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07-CV-1119-WKW [WO] |
| | ) | |
| BARBOUR COUNTY, ALABAMA, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this section 1983 action, Plaintiff Michael Travis Buckley seeks to hold Defendants, Barbour County, Alabama, and George Gamble, liable for a November 2006 accident that left Mr. Buckley severely injured. Before the court are Defendants' motions for summary judgment. (Docs. # 60, 62.) Upon consideration of the pleadings and law, the court determines that the motions are due to be granted in part and denied in part.

## I.   FACTS[1]

At the time of the accident, Mr. Buckley was a state inmate incarcerated at the Ventress Correctional Facility in Barbour County, Alabama, but on loan to a county work crew. He was assigned to do road work outside the prison under the supervision of Defendant George Gamble, an employee of Barbour County. The parties dispute the degree

_____

[1] The intent of this section is to provide a general narrative framework so that the reader will understand what this case is about. Disputed facts (even if not, ultimately, found to be "genuinely" disputed, or "material" for summary judgment purposes) are discussed in greater detail, and with fuller citations to the parties' exhibits, in the Discussion section, below. As explained in the standard of review section, the facts must be construed in the light most favorable to Mr. Buckley.

of authority Mr. Gamble held over the prison work crew, but it is undisputed that he was generally responsible for supervising their work and driving them from the prison, to job sites, and back to the prison again.  No state correctional officers or other state employees accompanied Mr. Gamble and the work crew during their duties.

On the morning of November 10, 2006, the four-person work crew was engaged in clearing dead pine trees from near a county road.  An inmate named Ricky Barrett cut down a large pine tree with a chainsaw, and the tree fell across a ditch and onto the road, creating a traffic hazard.  At this point, the parties' stories diverge.  Mr. Buckley claims that he was ordered by Mr. Gamble to help Barrett cut up the tree with chainsaws.  He says that despite expressing his discomfort with using a chainsaw and the general danger posed by the tree's position, Mr. Gamble ordered him to begin cutting the tree.  Mr. Buckley was under the tree in the ditch when a branch cut off by Barrett fell and pinned him to the ground.  Mr. Buckley does not suggest that his own use of a chainsaw led directly to his injury.

Mr. Gamble denies ordering Mr. Buckley to cut up the tree, stating instead that Mr. Buckley was supposed to stand next to the tree and direct traffic; he also denies hearing any protest about the dangerousness of the job.  The parties also disagree as to how Mr. Buckley was rescued from his position under the branch.  According to Mr. Buckley, his fellow inmate Barrett pulled the branch off him, while Mr. Gamble credits himself with attaching the work truck to the branch and pulling it off Mr. Buckley.  Mr. Buckley was severely injured, and is a paraplegic due to those injuries.

2

Much discussed by the parties is an Alabama Department of Corrections ("ADOC") regulation known as Regulation 320.  (Doc. # 64, Ex. E.)  Regulation 320 sets forth policies and procedures for the assignment and operation of inmate work crews by non-ADOC agencies.  Section V of Regulation 320 lays out "[w]ork squad safety procedures," which include the requirement of a "letter of understanding" between the prison warden and the agency for which the inmates work, and a requirement that a person designated the "Government Agency Inmate Supervisor or Representative" must "[r]eceive an orientation" and "[a]ttend a quarterly refresher training session."  No letter of understanding existed between ADOC and Barbour County.  Mr. Gamble had, however, attended an orientation class at Ventress Correctional Facility regarding the handling of work crews.

Annex B to Regulation 320 sets forth a more specific series of rules for supervisors of inmate work crews.  Particularly relevant is Rule 5, which instructs supervisors to "[o]rient each inmate in the use of issued equipment regardless of the inmate's claim of having had prior experience.  Specifically, orientation was to be conducted in the use of gas or electrically powered equipment before allowing" an inmate to use such equipment.  (Doc. # 64, Ex. E, at 8.)   The parties do not dispute that no one provided any "orientation" or other training about the use of chainsaws to Mr. Buckley.  They do dispute both the factual question of what exposure Mr. Gamble had to Regulation 320, and the legal question of Regulation 320's binding effect on Mr. Gamble or Barbour County.

## II.  JURISDICTION AND VENUE

The court has jurisdiction over this federal civil rights case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.  The existence of personal jurisdiction and proper venue has not been contested by the parties.

## III.  STANDARD OF REVIEW

### A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its

claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  If the evidence on which the nonmoving party relies, however, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573,

1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment should be granted in favor of the defendant.  *Celotex*, 477 U.S. at 323.

Thus, in cases where the evidence is admissible on its face or can be reduced to admissible form and establishes there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-24.

**B.  Qualified Immunity**

Mr. Gamble raises the defense of qualified immunity.  "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages" unless they have violated a clearly established constitutional right.  *Townsend v. Jefferson County*, No. 08-15583, 2010 WL 1189540, at *5 (11th Cir. March 30, 2010) (quotation marks omitted).  Because qualified immunity, as the name suggests, provides immunity from suit, rather than simply a defense to liability, its applicability should be resolved "at the earliest possible stage in litigation."  *Id*. (quotation marks omitted).

A qualified immunity determination involves several steps.  First, a defendant must establish that he was acting within his discretionary authority as a public employee when the conduct in question occurred.  *Id*.  Next, a plaintiff must demonstrate "'that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.'"  *Id*. (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009)).  Before *Pearson*, courts were required to conduct the inquiry in order, that is, to decide whether a right existed before deciding whether it was clearly established.  Now, however, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."  *Id*. (quoting *Pearson*, 129 S. Ct. at 818).

If the evidence establishes a constitutional violation, it must be one that is "clearly established" in order for it to survive a qualified immunity defense.  *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184-85 (11th Cir. 2009).  A constitutional violation is "clearly established" if "it would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted."  *Harper v. Lawrence County, Ala.,* 592 F.3d 1227, 1233 (11th Cir. 2010) (internal quotation omitted).  Such clarity may come from "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction."  *Id*.  At times, "'a general constitutional rule already identified . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'"  *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir.

2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (alteration in original)).   "A plaintiff need not show that the officer's conduct specifically has been held unlawful," but only that officers, or other public employees, would have "fair warning that their conduct was unconstitutional," on the basis of "sufficiently clear" law. *Bates v. Harvey*, 518 F.3d 1233, 1247-48 (11th Cir. 2008).

In this case, it is undisputed that Mr. Gamble was acting within his discretionary authority during the events in question, so the burden shifts to Mr. Buckley to show that his clearly established constitutional rights were violated. *Townsend*, 2010 WL 1189540, at *6. The substantive constitutional claim made by Mr. Buckley is that he was deprived of his Eighth Amendment right not to be subject to cruel and unusual punishment by Mr. Gamble's alleged assignment of him to the task that led to his injury.  To show deliberate indifference, Mr. Buckley must produce evidence that would permit a fact-finder to determine that Mr. Gamble had a "'(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than [gross] negligence.'" *Id.* (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (final alteration in original)).  The risk of serious harm must be a "'substantial'" one. *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

## IV.  DISCUSSION

### A.  **Mr. Gamble**

    *1.  Eighth Amendment Claim*

        *a.  Regulation 320*

As an initial matter, both sides confuse the relevance of Regulation 320 to the constitutional claim.  Mr. Buckley cites Regulation 320 as itself creating a standard of care that supervisors of inmate work crews were bound to follow.  (Doc. # 75 at 11.)  Mr. Gamble, at times, implicitly accepts this assertion, arguing that there is no evidence that he was "aware" of the Regulation, and thus that he could not have been deliberately indifferent, even if failure to follow the Regulation led to the accident.  (Doc. # 61, at 10-11.)  Mr. Gamble also argues that his unawareness of the Regulation entitles him to qualified immunity. (Doc. # 61, at 12-13.)  But the test for a deliberate indifference claim does not ask whether a defendant was deliberately indifferent to a state regulation, but whether he was deliberately indifferent to (meaning more than reckless or grossly negligent with regard to) a substantial risk of serious harm, defined as a matter of federal constitutional law.  *Farmer*, 511 U.S. at 835; *see also Cabberiza v. Moore*, 217 F.3d 1329, 1337 (11th Cir. 2000) (violations of state law do not give rise to federal constitutional claims).  Thus, the inquiry for qualified immunity purposes must be refocused to ask if there is a genuine issue of material fact whether Mr. Gamble's actions violated clearly established Eight Amendment law, as defined by the Alabama Supreme Court, the U.S. Court of Appeals for the Eleventh

Circuit, or the Supreme Court of the United States. *Amnesty Int'l*, 559 F.3d at 1184.

Regulation 320 nonetheless may have some relevance, however, because of the "subjective" component to a deliberate indifference claim, which requires that a defendant have actual awareness of the risk to which an inmate is subjected. Thus, it is helpful to begin the analysis by determining whether there is a genuine issue of material fact as to Mr. Gamble's awareness of Regulation 320.

Mr. Buckley attempts to use Regulation 320 to show that Mr. Gamble must have been on notice that the use of a chainsaw constitutes a substantial risk of serious harm, because he would have been alerted to the danger by his knowledge of Regulation 320.  (Doc. # 75, at 14-15.)   Somewhat mysteriously, neither party actually asked Mr. Gamble, in the deposition excerpts provided to the court, whether he was aware of Regulation 320; Mr. Gamble cites the deposition of his superior, Patrick McDougald, to the effect that McDougald was not aware of Regulation 320 and that Barbour County had not signed the sort of agreement contemplated by it.  (McDougald Dep. 48.)  Mr. Buckley's argument that Mr. Gamble was aware of Regulation 320 is based on a suggested inference that because Mr. Gamble, by his own account, went to a brief orientation at the prison, and some of the rules he remembered hearing there sound similar to those rules in Annex B of Regulation 320, he must have been aware of the Regulation itself, including Rule 5.[2]  (Doc. # 75 at 14-15.)

---

[2] Mr. Buckley also argues that ignorance of the law is no defense.  (Doc. # 75, at 14.)  But even if that maxim extends to the internal regulations of a state agency, which the court doubts, it is inapplicable here, because the subjective component of the deliberate indifference test asks what a defendant *actually* knew about a risk.  *See Townsend*, 2010 WL 1189540, at *7.

On this basis, the court would have been prepared to conclude that there was no genuine issue of material fact as to whether Mr. Gamble had read Regulation 320.  At the close of discovery, however, Mr. Buckley took the deposition of Lieutenant Sherwin V. Carter, an official at Ventress Correctional Facility, and submitted excerpts from his deposition and exhibits provided by Lt. Carter as a supplement to his opposition to the motions for summary judgment.  (Doc. # 94.)  The court granted the motion to supplement (Doc. # 95), and must now consider the impact of the new evidence.

The exhibits submitted indicate that Mr. Gamble and two other Barbour County employees signed a two-page document known as Annex A to Regulation 320.  (Doc. # 94-1, at 28-29).  Mr. Gamble signed the document on October 18, 2006.  While Annex A contains a set of 24 rules to be followed by supervisors of inmates, these rules do not include the one requiring training before inmates use gas or electrically powered equipment.  In the exhibits submitted, that rule is found in a document labeled "Standard Operating Procedures Number 5-15" and signed by the warden of Ventress Correctional Facility on December 11, 2003.  (Doc. # 94-1, at 19-25.)  While that document does not mention Regulation 320, it is substantially similar to the version of Regulation 320 submitted with Defendants' motion for summary judgment.  (Doc. # 64, Ex. E.)  In particular, both contain the same rule requiring that "orientation should be conducted in the use of gasoline or electrically powered equipment before allowing" an inmate to use it.  (Doc. # 64, Ex. E, at 8; Doc. # 94-1 at 22.)

Lt. Carter's deposition testimony indicates that even though the exhibit actually signed

11

by Mr. Gamble did not contain this rule, it was a "signature page" for a larger document, which would have included the gas-equipment rule.  (Doc. # 94-1, at 16-17.)  Thus, Mr. Buckley argues, Mr. Gamble read, or at least signed a document that included, the gas-equipment rule.  In Defendants' opposition to the motion to supplement (Doc. # 98), they note this discrepancy in the dates on the signature pages and submit that it prevents the drawing of any inference that Mr. Gamble or the other Barbour County employees actually read the full set of documents.  While the issue is certainly subject to contradiction at trial, the court, drawing all inferences in favor of the party not moving for summary judgment, must agree with Mr. Buckley that a genuine issue of material fact now exists as to Mr. Gamble's awareness of Regulation 320's requirements, including the rule that inmates be trained on the use of gas-powered equipment.

Together with the disputed issue whether Mr. Gamble heard Mr. Buckley protest, just before the incident, that he did not want to use the chainsaw, there is a question of fact whether Mr. Gamble was subjectively aware of the risk posed by cutting up the tree with a chainsaw.  While this is relevant to the deliberate indifference claim, it is not dispositive of it, because the risk posed must also be one objectively serious enough to satisfy the deliberate indifference inquiry.  In addition, the hybrid question of whether Mr. Gamble's conduct rose to the level of "gross negligence" must be addressed before liability may be found.

### b. *Workplace Deliberate Indifference Claims*

It is a difficult question whether, taking all the facts in the light most favorable to Mr. Buckley, Mr. Gamble could be found to have violated the Eighth Amendment.  A number of courts have examined the interplay of inmate labor and the Eighth Amendment, determining, for example, that it "forbids knowingly compelling an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful." *Sanchez v. Taggart*, 144 F.3d 1154, 1156 (8th Cir. 1998).  From this general principle, however, countless permutations emerge.  In *Sanchez*, the court determined that a claim should survive qualified immunity when an inmate was compelled to assist in "sandbagging duty" during a flood, even though the defendant was aware that, the previous day, such duty had caused the inmate to re-injure his back to the point of being "unable to stand" and requiring pain medication, and checking the inmate's file would have revealed his preexisting back condition.  Another circuit employs a "totality of the circumstances" test for determining when inmate labor violates the Eighth Amendment.  *Jackson v. Cain*, 864 F.2d 1235, 1245 (5th Cir. 1988).  In *Jackson*, the Fifth Circuit held that, while a claim that inmates were required to work in "heavy corn dust without a mask could conceivably [be] so deleterious to health" as to constitute a constitutional violation, such claims failed absent a showing that inmates were subject to conditions any worse than those prevailing for workers in the "surrounding community."  *Id*.  This theory had previously led the Fifth Circuit to hold that being forced to work in fields recently sprayed with a particular pesticide did not violate

13

the Eighth Amendment. *Sampson v. King*, 693 F.2d 566, 569 (5th Cir. 1982). Neither the

Supreme Court nor the Eleventh Circuit has ever adopted this community standards inquiry,

and in context it might be best read as a gloss on the question whether a defendant's actions

show deliberate indifference to a *serious* risk of *substantial* harm, based on a presumption

that private employers are unlikely to subject their employees to such risks.

Unfortunately, this court is left where the Southern District of Georgia found itself

sixteen years ago, "unable to locate any Eleventh Circuit cases discussing what constitutes

deliberate indifference in the workplace safety context." *Lee v. Sikes*, 870 F. Supp. 1096,

1100 (S.D. Ga. 1994). *Lee*, however, bears some resemblance to this case, as it concerned

an inmate injured while doing what is arguably inherently risky work, in that case working

on a hog farm with 250-to-400 pound hogs. In particular, two facts in that case parallel the

facts here. First, inmates received no particular training in handling hogs, and, second, an

internal policy was arguably violated, but there was no evidence the defendant had any

knowledge of the policy. Noting that "in order to be *deliberately* indifferent to safety rules,

[d]efendants would, at least, have to be aware of them," the court concluded that "even

assuming that [d]efendants . . . knew that boar hogs were dangerous or knew that protective

equipment should be used, such a showing falls short of creating a genuine issue of deliberate

indifference to workplace safety." *Id*. At most, the evidence supported a claim for

negligence. *Id*.; *accord Stephens v. Johnson*, 83 F.3d 198, 200-01 (8th Cir. 1996) (failure

to provide safety equipment was negligence, not deliberate indifference); *Warren v. State of*

14

*Mo.*, 995 F.2d 130, 130 (8th Cir. 1993) (same, with regard to "an anti-kickback device" on an "industrial table saw," even when officials knew of prior injuries from the same cause); *Brown v. Richmond County Corr. Inst.*, No. CV 105-118, 2006 WL 1431488, at *1-2 (S.D. Ga. May 22, 2006) (same for failure to provide plaintiff with a safety helmet while cutting trees, when a branch hit plaintiff on the head).[3]

In this case, the only factors possibly distinguishing Mr. Buckley's claims from the other cases is the disregard of Regulation 320, and his allegation that he told Mr. Gamble that he was uncomfortable using the chainsaw, but Mr. Gamble ordered him to go ahead and cut up the tree anyway. Specifically, Mr. Buckley states that, after being told to "help Ricky cut the tree up real quick," he "said Mr. George you know I don't like messing with them saws. I just don't like going down in that ditch. And he said well, son we need to get this done, Michael, do this. And I said, okay, Mr. George." (Buckley Dep. at 66.) Arguably, this creates a higher level of scienter on Mr. Gamble's part than in the other cases, because he was on notice not just that chainsawing, like managing hogs or using industrial table saws, was generally a risky activity, but that the particular inmate in question had an individualized fear or objection to engaging in the activity.

Thus, the answer to the ultimate question whether Mr. Buckley's evidence gives rise to a valid Eighth Amendment deliberate indifference claim is not an obvious one. But

---

[3] *Brown* is similar to this case in that a plaintiff was injured during a tree cutting operation, although the statements of facts in that case is rather sketchy, and it is unclear whether a chainsaw was being used. 2006 WL 1431488, at *2. Also, the plaintiff's injuries were "nonspecific," in contrast to the severe injury suffered by Mr. Buckley. *Id.*

because Mr. Gamble invokes qualified immunity, the task before the court is easier.  After *Pearson*, it is no longer required to decide whether an actual constitutional violation has been alleged before proceeding to determine whether such a violation was clearly established. This case is an appropriate one in which to use this newfound discretion.  The court is mindful that it is not required that a case exist with precisely similar facts in order to deny qualified immunity.  A "general constitutional rule . . . may apply with obvious clarity" to a new factual situation.  *Goebert*, 510 F.3d at 1330.  But that is not the case here.  The parties have not cited, and independent research has not discovered, any binding decisions of relevant courts addressing deliberate indifference in the prison workplace context.  The outcome of this case is not "obvious" from the general Eighth Amendment law of deliberate indifference.  To the extent cases from other jurisdictions are considered as persuasive authority, the bulk of them indicate that there is a high bar for making prison workplace condition claims constitutionally cognizable, and failure to take proper precautions with respect to higher-risk jobs is typically considered negligence, rather than deliberate indifference.

Accordingly, any Eighth Amendment violation Mr. Gamble committed was not clearly established, and he is entitled to qualified immunity with respect to this claim.  The motion for summary judgment as to the Eighth Amendment claim against Mr. Gamble is due to be granted.

   *2.  State Law Claim*

16

Mr. Buckley's state law claim arises under a statutory provision creating a cause of action to inmates "participating in a work release program authorized by this chapter or otherwise working outside the jail or a correctional facility." Ala. Code § 14-8-40.  While it appears that activity during which the injury took place may not have been a "work release program" as defined in the statute, Mr. Buckley was indisputably "otherwise working outside" his "correctional facility," so Defendants' argument based on the precise nature of the program has no purchase.  There is a dearth of a case law applying this part of section 14-8-40, perhaps because it was enacted only in 2002.  The definition of "willful negligence" is elusive.  In general, "willful negligence" is apparently akin to "wanton misconduct" or "wanton and reckless misconduct."  *Ex parte Randall*, 971 So. 2d 652, 680 n.20 (Ala. 2007) (Murdock, J., dissenting) (citing Speiser, *et al.*, 3 *The American Law of Torts*, § 10.1 at 358 (1986)).  Wantonness is "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3).[4]  It involves a negligent act or omission "while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result," but it does not require a "specific design or intent to injure the plaintiff."  *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998).  Yet, the majority opinion in *Randall* drew a distinction between "wanton

---

[4] That definition is limited by its own terms to the Alabama Code article discussing punitive damages, but there is no indication that "wantonness" has another meaning elsewhere in Alabama law, and the Alabama Supreme Court has cited that statute as providing a general definition. *Alfa Mutual Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998).

misconduct" and conduct that "rise[s] to the level of willfulness and maliciousness" necessary to overcome state-agent immunity. *Randall*, 971 So. 2d at 664.

A somewhat circular situation seems to exist in which "willful negligence" is often equated with "wantonness," yet "wantonness" is then described as being less than "willful" misconduct. *See id. at* 679-80 (Murdock, J., dissenting). Perhaps there is some distinction between "willful *negligence*" and "willfulness," although the court is loath to attempt to describe it in this opinion. At trial, however, the parties will be expected to clearly articulate the standard of care they believe section 14-8-40 imposes.

Taking the facts in the light most favorable to him, Mr. Buckley has proffered sufficient evidence to survive summary judgment on the willful negligence claim. The general risks created by the use of a chainsaw, combined with the specific situation created by the tree laying across the ditch, the order to put himself in the vicinity of the downed tree, and topped by Mr. Buckley's warning to Mr. Gamble that he was uncomfortable using a chainsaw, are sufficient to create a genuine issue of fact. Mr. Gamble's signature on the rules governing work squads may also be relevant.

The court cautions Mr. Buckley, however, that at trial the claim for willful negligence cannot rest entirely on an alleged failure to abide by Regulation 320, as argued in his brief. (Doc. # 75, at 23.) A cause of action for willful or wanton conduct is, by definition, distinct from one for negligence *per se*, based solely on failure to abide by a statutory requirement.[5]

---

[5] As discussed further with regard to the County's liability, it is far from clear that rules set out in an appendix to an administrative regulation could constitute a basis for a negligence *per se* claim.

*See Gilmer v. Crestview Mem. Funeral Home, Inc.*, No. 1051429, 2009 WL 1875508, at *10 (Ala. June 30, 2009) (Murdock, J., concurring and dissenting); *Murray v. Ala. Power Co.*, 413 So. 2d 1109, 1112-13 (Ala. 1982). Regulation 320 (specifically, Annex B's rules) may nonetheless be relevant to show the general standard of care. *Murray*, 413 So. 2d at 1113-14.

Next, Mr. Gamble argues that, regardless of whether the evidence would support a willful negligence claim, he is entitled to either state sovereign immunity or state agent immunity. (Doc. # 61, at 14-15.) Mr. Gamble cites a precedent in which a town employee was found to have been acting as an "agent of the State"[6] when driving prisoners back to prison after a work release program. *Town of Loxley v. Coleman*, 720 So. 2d 907, 908-09 (Ala. 1998). The court concluded that because there was "no question that the doctrine of sovereign immunity would apply" the town and its employee "were acting as agents of the State, by reason of their service in transporting" the inmate "as a part of the work-release program." *Id*. at 908. *Coleman* is less helpful to Mr. Gamble than it might initially seem. After holding that the town employee was a state agent while transporting prisoners on the state's behalf, the court went on to declare that it "need not address" the extent to which she was entitled to either state sovereign immunity or state agent immunity, because the claims

---

[6] Confusingly, while *Coleman* uses the phrase "agent of the State," the determination that the defendant was such an agent was apparently in relation to the absolute state sovereign immunity granted by the Alabama Constitution and extended to state employees and agents when sued in their *official* capacities, not a conclusion that she was actually entitled to the qualified "state agent immunity" that applies to state employees and agents when sued in their *individual* capacities. *See Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000). In any event, Mr. Gamble's reply brief concedes that a claim for willful misconduct would not be barred by state agent immunity, so the court will not discuss that variety of immunity any further, although *Randall* would seem to make the issue a difficult one. (Doc. # 79, at 16.)

alleged she was acting outside the scope of her employment, and because driving was a ministerial function, not a discretionary one as required to invoke state agent immunity. *Coleman* avoided the question, so it is at best helpful to Mr. Gamble by implication.

Here, Mr. Gamble is not accused of acting outside the scope of his employment, and his decisions in directing his inmate employees are likely discretionary, rather than, as was driving a vehicle in *Coleman*, ministerial.  If Mr. Buckley's claim were solely a common law wantonness claim, it would be a close question whether Mr. Gamble was entitled to state sovereign immunity.   But given that Mr. Buckley is proceeding under a statute that specifically authorizes claims by state inmates against a "county . . . or employee thereof" for willful negligence, it is difficult to understand how the legislature could have meant for such a claim as this to be barred by state sovereign immunity.  *See* Ala. Code § 14-8-40.  Doing so would essentially render the statute a nullity, since county employees supervising state inmates in county custody would always be performing a function for which state employees would be immunized.  As noted, the relevant part of section 14-8-40 was enacted in 2002, four years after *Coleman* was decided, so whatever principles may be gleaned from *Coleman*, it cannot be read as directly speaking to what immunities are available under that section.

Accordingly, Mr. Gamble is not entitled to immunity for the willful negligence claim brought pursuant to section 14-8-40, and adequate evidence has been adduced to survive summary judgment.  The motion for summary judgment on that count is due to be denied.

## B. **Barbour County**

### *1. Eighth Amendment Claim*

While Barbour County is not entitled to the defense of qualified immunity, Mr. Buckley's Eighth Amendment claim against it must survive a different barrier to recovery: the heightened standard for the imposition of liability against municipalities in section 1983 claims. *See generally Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). "A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009). This "may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of [the city's] inhabitants.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).[7] The policy or custom need not be an "official" policy promulgated as a regulation or ordinance, but can be a "practice or custom so pervasive[] as to be the functional equivalent of a policy adopted by the final policymaker." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (quotation marks and punctuation omitted). When a failure to train (of any sort) is at issue, a plaintiff must "'present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'"

---

[7] "[A]dequate training" in cases such as *Lewis* typically refers to the training of law enforcement officers in the use of deadly force, a well-established constitutional requirement, resulting in injury to a third party. Thus, that claim is not directly analogous to the "failure-to-train" claims raised here. Further, as explained below, such claims bear a special imprimatur, as the only type of failure-to-train claim the Supreme Court has specifically endorsed.

*Gilliam ex rel. Waldroup v. City of Prattville*, 667 F. Supp. 2d 1276, 1292 (M.D. Ala. 2009) (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)). This requirement is "intentionally onerous" to avoid permitting a municipality to suffer *respondeat superior* liability. *Id*. The requirement is "satisfied in only two circumstances." *Id*. First, when a plaintiff can show that the municipality knew of a pattern of similar violations in the past, and second, if "the likelihood for constitutional violation was so high as to make the need for training or supervision obvious." *Id.* (citing *Lewis*, 561 F.3d at 1293).

Mr. Buckley attempts to satisfy this requirement by demonstrating that Barbour County had a "policy or custom" of using inmate labor without training inmates "on safe equipment operation and . . . specifically . . . [on] the safe operation of gasoline and electrically powered equipment." (Doc. # 74, at 11.)    First, Mr. Buckley argues that a pattern of violations existed based on two previous inmate injuries that occurred on work squads.  (Doc. # 74, at 13.)  The basis for this claim is Mr. Gamble's recollection in his deposition of an inmate who "scratched or bent his knee," but about whom Mr. Gamble remembered nothing else, and another inmate who Mr. Gamble said "pulled something in his leg or something" while using a weed-eater. (Gamble Dep. 70-71.) These two incidents are insufficient to establish municipal liability. There is no evidence whatsoever of the cause of the other inmates' injuries, or whether they would have been prevented by any sort of training.

Second, Mr. Gamble apparently argues that "the likelihood for constitutional violation was so high as to make the need for training or supervision obvious." *Gilliam*, 667 F. Supp. 2d at 1292. In light of precedent, the court is constrained to disagree. In *Gilliam*, another judge of this court found that failure to train a police force in the use of Tasers did not meet the "obvious need" test. *Id*. at 1292-93. In doing so, *Gilliam* noted that the Supreme Court "in dictum, has given only one example of a need to train being 'so obvious' that a municipality could be liable without a pattern of constitutional violations," and that example is failing to train police officers in the use of deadly force. *Id*. at 1292 (citing *City of Canton*, 489 U.S. at 390). The Eleventh Circuit has repeatedly rejected attempts to extend failure-to-train liability to other law-enforcement situations, such as the use of "hobble" restraints, *Lewis*, 561 F.3d at 1293, responding to complaints about the use of handcuffs, *Gold*, 151 F.3d at 1352, and the identification and treatment of mentally ill inmates by jail staff. *Young v. City of Augusta*, 59 F.3d 1160, 1171-72 (11th Cir. 1995).[8]

---

[8] Mr. McDougald's uncontradicted deposition testimony is that the County *does* have what might be described as an informal training program, in that inmates are required to demonstrate their ability to use equipment such as chainsaws in the county yard before being allowed to do so in the field. (McDougald Dep. 51-52.) The fact that Mr. Buckley himself received no training does not establish that the county did not have the policy discussed by Mr. McDougald, only that it was not followed in a particular instance. Thus, the burden on Mr. Buckley is to show not just that a county is constitutionally required to conduct *some* training in the use of gas-powered equipment, but that the training offered is constitutionally insufficient. He makes no attempt to do so.

For the same reason, even if the newly presented evidence (*See* Doc. # 94) is taken to create a genuine issue of fact whether the County was aware of Regulation 320 and its training requirement, and even assuming such awareness of a state regulation is theoretically relevant to the constitutional claim, the dispute would not be material to the outcome, given the lack of evidence that Barbour County has a policy or procedure of failing to conduct any "orientation" to gas-powered equipment. In any event, the court doubts that the signatures of low- to mid-level

23

Given this reluctance to extend failure-to-train liability to situations involving the *offensive* use of force by law enforcement officers, even in situations where a degree of risk might be termed, in ordinary language, "obvious," an extension to include training inmates in the proper use of work equipment cannot be justified.  Indeed, Mr. Buckley cites no case holding, or even discussing, a constitutional claim against a municipality for similar conduct.  Mr. Buckley's primary authority appears to be this court's prior opinion and order (Doc. # 47) denying in large part Defendants' motion to dismiss.  In that document, the court did state that "[t]he risk to inmates from failure to train in this case was obvious."  (Doc. # 47, at 12.)  In retrospect, this was an unfortunate turn of phrase, conflating what may be, in the lay sense, a clear or apparent risk with the constitutional standard for the imposition of municipal liability.  The court notes that it did not discuss the line of cases analyzed above (nor, it appears, were they discussed by the parties at that stage), and was addressing a conceptually different aspect of the claim, the "subjective" component to a deliberate indifference claim.  (Doc. # 47, at 11-12.)  As the court noted earlier in that opinion, "the County's argument is more appropriate at the summary judgment stage."  (Doc. # 47, at 8.)  The litigation has now reached that stage, and Barbour County's arguments are well taken.[9]  The motion to dismiss the Eighth Amendment claim against the County is due to be granted.

---

employees establish a genuine issue of material fact as to what the County as an entity knew, especially when those employees (other than Mr. Gamble) were not deposed and have been identified only by the recollections of ADOC Lt. Carter.

[9] Again, the court finds Regulation 320 to be of no relevance to whether a constitutional cause of action has been stated, so it is not further discussed at this stage.

*2. State Law Claim*

There is no need to recapitulate the background given earlier with respect to the state-law claim against Mr. Gamble.  The issue is whether the claim that could survive against Mr. Gamble as the direct supervisor of Mr. Buckley can also survive against Barbour County.  On the one hand, section 14-8-40 contemplates that willful negligence claims may be made against a "county," as well as "an employee thereof."  On the other hand, the tort remains willful negligence, which means that the basis for the claim against Barbour County cannot be simply *respondeat superior* for the torts of Mr. Gamble.  Thus, the analysis relied on to deny the motion for summary judgment in favor of Mr. Gamble does not necessarily suffice as to the County.

Perhaps recognizing this, Mr. Buckley asserts that Regulation 320 imposed a legal duty on Barbour County, and that Alabama law indicates that failure to conform with duties imposed by "statute or ordinance" gives rise to negligence claims.  *Keeton v. Fayette County*, 558 So. 2d 884, 887 (Ala. 1989).  First, *Keeton* says that such a violation "may be negligence *per se* or negligence as a matter of law."  *Id*.  Mr. Buckley makes no attempt to explain how a violation of a regulation alone could establish *willful* negligence.  Second, Regulation 320 is neither a statute nor an ordinance.  It is an internal ADOC regulation, to which the rules Barbour County is alleged to have violated are attached as an "Annex."  (Doc. # 64, Ex. E.)  The Regulation appears to contemplate that such rules will be applied to "governmental agenc[ies]" using inmate labor via a letter of understanding.  (Doc. # 64, Ex. E, at 2-3.)

While the newly submitted evidence (*See* Doc. # 94) is potentially damaging to Mr. Gamble, it does little to change the calculus against the County.  A claim for willful negligence cannot be premised on the mere fact that a regulation was violated.

This is the only argument Mr. Buckley makes in support of the substance of his willful negligence claim against the County.  The different treatment of Barbour County and Mr. Gamble is further justified given that Mr. Buckley's alleged statement that he was uncomfortable using a chainsaw is a vital part of the claim against Mr. Gamble for willful negligence.  Obviously, Barbour County as an institution was not aware of Mr. Buckley's statement, which was made in the field only minutes before the accident occurred.  The same is true of Mr. Gamble's October 18, 2006 signature on the rules governing work squads.  To hold Barbour County liable on the basis of the statement and Mr. Gamble's signature would be to impose *respondeat superior* liability for Mr. Gamble's acts and omissions, and to impute Mr. Gamble's state of mind to the County.  Without the statement and signature, the claim against the County is simply that, as a general matter, more training of inmate work squads would have been advisable.  This may state a claim for negligence, but, even assuming a duty to train inmates, it is not a situation in which injury would "likely or

probably result."[10]   *Roush*, 723 So. 2d at 1256.   Accordingly, the County's motion for summary judgment on this claim is due to be granted.

## V.  MOTIONS TO STRIKE

Mr. Buckley moved to strike the affidavits of Ricky Barrett (Doc. # 77) and Patrick McDougald.  (Doc. # 78.)  Given the variance between the conclusory assertions in the affidavit and Mr. Barrett's deposition testimony, which specifically disavows personal knowledge of many of the items in the affidavit, the motion to strike it is due to be granted. Many items in the McDougald affidavit contain quasi-legal assertions about the "authority" of Mr. Gamble over inmates.  (Doc. # 78, Ex. 2.)  With the understanding that the court regards the affidavit as stating Mr. McDougald's personal understanding of the operation of the inmate work squad system, and that issues of law are for the court to decide, the motion is due to be denied.  However, the court notes that its decisions on the summary judgment motion were in any event not based on the issue of the degree of control exercised by Mr. Gamble or Barbour County over the inmates.

## VI.  CONCLUSION

For the foregoing reasons, it is ORDERED that Mr. Gamble's motion for summary judgment (Doc. # 60) is GRANTED in part and DENIED in part.  It is GRANTED with

---

[10] On the issue of duty and its breach, Mr. McDougald's uncontradicted deposition testimony about the county's informal training program is again relevant.  (McDougald Dep. at 51-52.); *see supra* note 8.  Thus, even if the other issues discussed were not present, Mr. Buckley would need to explain what level of training, in his view, is required of the County in order to meet the standard of care.  He makes no attempt to do this, asserting only that *he* was not trained in the use of a chainsaw.  But an individual failure to train a particular inmate cannot, without more, establish that the County was liable for willful negligence.

respect to the section 1983 constitutional claim, and DENIED with respect to the state law willful negligence claim.  It is further ORDERED that Barbour County's motion for summary judgment (Doc. # 62) is GRANTED and all claims against Barbour County are DISMISSED with prejudice.  It is further ORDERED that the motion to strike Ricky Barrett's affidavit (Doc. # 77) is GRANTED, and the motion to strike Patrick McDougald's affidavit (Doc. # 78) is DENIED.

　　　　DONE this 17th day of May, 2010.


　　　　　　　　　　　　　　/s/ W.  Keith Watkins
　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE